UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


| | |
|---|---|
| LAKSMI GONZALEZ, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) C.A. No. 11-cv-30033-MAP |
| | ) |
| MICHAEL ASTRUE, | ) |
| Commissioner of | ) |
| Social Security, | ) |
| Defendant | ) |


MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANT'S MOTION FOR ORDER AFFIRMING
DECISION OF THE COMMISSIONER
(Dkt. Nos. 7 & 10)

March 30, 2012


PONSOR, U.S.D.J.


I. INTRODUCTION

Pursuant to 42 U.S.C. § 405(g), this action seeks review of a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits.  Plaintiff applied for disability benefits on February 12, 2009, alleging disability since January 1, 1999 due to a left knee injury and bipolar disorder.  After a hearing on July 28, 2010, the

Administrative Law Judge ("ALJ") found that Plaintiff was not disabled and denied Plaintiff's claim. (A.R. 7-20).

Plaintiff filed this complaint on February 1, 2011, seeking a reversal of the ALJ's decision. He[1] moves for judgment on the pleadings (Dkt. No. 7) arguing that the disability determination did not conform to the applicable legal standards and was not supported by substantial evidence. Defendant in turn moves for an order affirming the decision of the Commissioner (Dkt. No. 10.) For the reasons stated below, Plaintiff's motion will be denied and Defendant's motion will be allowed.

## II. FACTS

A.  Plaintiff's Medical Condition.

Laksmi Gonzalez, age thirty-two, is originally from the Dominican Republic. (A.R. 32-43). He lived with his mother until high school, when he became addicted to crack and was sent to live with his father in the United States. (Id.) He worked briefly as a customer service representative in 2002. (A.R. 392).

1.  Knee Injury.

In 2002, Gonzalez injured his left knee after falling

---

[1] There are occasional references to Plaintiff in the record that use female pronouns. (See, e.g., A.R. 17.) Plaintiff's own motion uses male pronouns, and the court will as well.

down a flight of stairs, while working for his then
employer, Rent-A-Center. (Id.)  In 2003, an arthroscopy
revealed a torn medial meniscus with patella articular
injury and partial cruciate tear. (A.R. 391.)  To fix the
problem Plaintiff underwent arthroscopy, partial medial
meniscetomy, partial lateral meniscetomy, debridment, and
shaving of the patella by Dr. Brian Awbray on March 5, 2004.
(A.R. 404.)

In 2009, Plaintiff was still suffering from knee pain.
He complained of constant pain, and being able to walk or
sit for only fifteen or twenty minutes before triggering
more knee pain.

With his pain level high, Plaintiff underwent another
arthroscopy by Dr. Thomas Rossi in 2009.  This arthroscopy
revealed that "nothing appeared sufficient to explain the
level of [Gonzalez's] pain." (A.R. 394.)

In 2009, Plaintiff's primary care doctor, Dr.
Castrillon wrote that "major function" had been restored to
Plaintiff's knee. (A.R. 388.)  Furthermore, she said that
his prognosis was good with rest and physical therapy. (A.R.
300.)  While Plaintiff discontinued physical therapy in
June, (A.R. 352,) Dr. Castrillon nonetheless cleared him to
play college sports, (A.R. 451).  On May 10, 2010 she said
that his gait was normal and that he may use "his knee pain

as an excuse for his depression." (A.R. 509.)

    2.  <u>Bipolar Disorder</u>.

In addition to his knee problems, Plaintiff also suffers from bipolar disorder and depression.  He was diagnosed as bipolar at age fifteen, when he also started abusing crack cocaine and alcohol.  Plaintiff went through three drug rehabilitation programs from age fifteen to age thirty-one. (A.R. 343.)

    a.  <u>Medical Assessments of Plaintiff's Bipolar Disorder</u>.

On December 17, 2008, Plaintiff reported to an emergency room at the Centro Medico Escaño -- a hospital in the Dominican Republic -- saying "I need help. I use crack." (A.R. 379.)  After discharge from the hospital, Gonzalez moved back to the United States and entered the Breath of Life sober house in Holyoke, Massachusetts.  At that time, he was taking Klonopin, an anti-anxiety drug; Seroquel, an anti-psychotic; and Effexor, an antidepressant. (A.R. 242.)

On January 13, 2009, Plaintiff presented to the emergency department at Providence Behavioral Health Hospital in Holyoke.  He said that he was out of control and feeling suicidal after running out of his prescriptions for psychoactive medications.  (A.R. 239.)  Plaintiff was stabilized, given his medications, and referred for

psychiatric treatment.

On January 23, 2009, Plaintiff began treatment with Juan Rivera, a psychologist, who noted that Plaintiff was suffering from mood swings, auditory hallucinations after the use of crack, and irritability.  (A.R. 255-61.)  Dr. Rivera diagnosed Plaintiff with Bipolar Disorder, Most Recent Episode, Mixed, in Partial Remission.  (A.R. 261.) Despite these diagnoses, Dr. Rivera found that Plaintiff's mental status was normal. (A.R. 260.)

In a treatment report prepared on February 2, 2009 for the Massachusetts Department of Developmental Services, another psychiatrist, Dr. Aaron Leavitt, said that Gonzalez's prognosis was poor to fair with treatment and that his abilities to understand and remember and to concentrate and persist were affected when his medications wore off. (A.R. 245-50.)  Furthermore, Dr. Leavitt said, Gonzalez's ability to interact with co-workers was "moderate with psychotropic meds." (A.R. 249.)

On March 24, 2009, Dr. Rivera discharged Plaintiff due to a loss of contact and noted that the Plaintiff had a "good response" to counseling and medication.  (A.R. 362.)

Dr. Abel Gonzalez examined Plaintiff on March 31, 2010. According to Dr. Gonzalez, Plaintiff said that he was "emotionally unstable," but was feeling well with his

current medication treatment.  (A.R. 471.)  Dr. Gonzalez found that Plaintiff's mental examination was normal except for limited insight. (A.R. 472.)

Dr. Gonzalez referred Plaintiff to a therapist, Shirley Deshields.  In an undated report written some time after October 2009, DeShields noted that Plaintiff had a good prognosis and was improving with his medications.  (A.R. 436.)  She thought that he was not yet ready to take on formal employment, but noted that he was nonetheless functioning well in his substance abuse home where he worked as a cook. (A.R. 428.)

His treating primary care physician, Dr. Castrillon, also continued to see Plaintiff's mental health improving. On February 9, 2010, she wrote that Plaintiff had intermittent panic attacks that he was able to control with Xanax and behavioral therapy.  (A.R. 451.)  He was sleeping well and about to start college.  (Id.)

    b.    Agency Assessments of Plaintiff's Bipolar
          Disorder

In a report dated April 29, 2009, Dr. Jon Perlman, a state agency psychologist, reported that Plaintiff could understand and remember simple instructions, complete simple routine tasks, and behave in a socially-acceptable manner. (A.R. 308.)  He found "no longitudinal evidence of a severe

6

disorder or severe limitations." (Id.) Dr. Perlman found that Plaintiff's current bipolar disorder was severe but not expected to last more than twelve months. (Id.)

On October 9, 2009, Plaintiff was evaluated by another state agency psychologist, Dr. Whitehorn. According to Dr. Whitehorn, "[w]hat is notable about this case is that virtually every mental status eval[ualtion] in the record is completely [within normal limits]," with only two exceptions. (A.R. 425.) Dr. Whitehorn found that "[d]espite some resistance to being bossed around, [Plaintiff] would be able to tolerate routine supervision at work," and that the Plaintiff "would be able to sustain pace, focus, and attendance at work." (Id.)

B.   The Commissioner's Decision.

At Step One of the disability adjudicative process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 1999, the alleged onset date. (A.R. 10.) At Step Two, the ALJ found that Plaintiff had the severe impairments of left knee injury with resulting pain and bipolar disorder. (Id.) At Step Three, the ALJ found that Plaintiff's impairments did not meet or medically equal any of the listed impairments. (Id.) At Step Four, the ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") to perform light work

7

with the following additional limitations: Plaintiff cannot operate foot or leg controls with his left leg; cannot perform work at heights; cannot perform work requiring the use of ropes, ladders, and/or scaffolds; cannot be exposed to dangerous moving machinery; cannot work outside of environments having more than incidental exposure to extreme cold or vibration; cannot, more than occasionally, use ramps or stairs; cannot, more than occasionally, kneel, crouch or crawl; cannot perform work that does not consist of only simple, unskilled tasks and that does not require more than incidental contact with the public; and cannot perform work requiring more than occasional contact with co-workers. (A.R. 11.)  At Step Five, the ALJ concluded that Plaintiff could perform work that existed in significant numbers in the national economy under his current RFC. (Id.)

### III. DISCUSSION

Plaintiff argues that the ALJ erred in his assessment of Plaintiff's RFC at Step 4.

A.   Standard of Review.

Judicial review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner applied the correct legal standards.  Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001).  The responsibility for

weighing conflicting evidence and resolving issues of credibility belongs to the Commissioner and his designee, the ALJ.  See id. at 10.  The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  Accordingly, the court must affirm the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). This is true "even if the record arguably could justify a different conclusion." Rodriguez-Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

   B.   The RFC Determination

   As noted above, at Step 4 of his analysis the ALJ made an RFC assessment of Plaintiff.  An RFC is "the most [an individual] can still do despite his or her limitations," 20 C.F.R. § 404.1545 (a)(1).  Furthermore, the RFC assessment "must be based on all the relevant evidence in [a Plaintiff's] case record" and must encompass both medical and non-medical evidence.  20 C.F.R. §§404.1545(a)(1), (3), (b), 416.945(a)(1), (3), (b).

Plaintiff challenges the ALJ's RFC determination, arguing that he ignored Plaintiff's pain from his knee injury and did not adequately consider Plaintiff's mental state with his bipolar disorder which included hallucinations.

1.   The Knee Injury.

The ALJ's extensive knee injury related RFC restrictions were carefully tailored to the evidence of record and were appropriate given the relatively positive prognoses given by Plaintiff's primary care doctor and knee surgeon.   Despite almost no evidence that Plaintiff has significant remaining knee issues, the ALJ nonetheless fashioned a list of RFC limitations that would prevent the Plaintiff from having to use his knee.   He limited Plaintiff from using his left leg, from using stairs and ladders, and from kneeling more than occasionally.   (A.R. 17.)

In assessing a Plaintiff's complaints of pain, an ALJ must ascertain whether there is a "medically determinable impairment that could reasonably be expected to produce [a claimant's] symptoms, such as pain." 20 C.F.R. § 404.1529. Here, it is clear that any such impairments were limited. Indeed, when conducting an arthroscopy of Plaintiff's knee in 2009, his surgeon, Dr. Rossi, found that "nothing appeared sufficient to explain the level of [Plaintiff's]

pain." (A.R. 394.)

Defendant further points out that Plaintiff's complaint of a disabling knee condition is undermined by the medical evidence and by the fact that Plaintiff (1) chose to discontinue recommended physical therapy, (A.R. 352); (2) sought and obtained medical clearance to participate in school sports, (A.R. 451); and (3) only took over-the-counter medication, (A.R. 180).

With so little evidence of a disabling knee condition, the ALJ's generous and extensive RFC limitations were more than adequately supported by the medical evidence of record.

2.   The Bipolar Disorder.

Plaintiff further argues that the ALJ's RFC analysis failed to consider his mental state, which allegedly included hallucinations, and his use of the medication Klonopin to control his anxiety.  Yet, contrary to Plaintiff's claims, there is no evidence that the ALJ "ignore[d] medical evidence or substitue[d] his own views for the controverted medical opinion."  Nguyen v. Chater, 172 F.3d 31, 31 (1st Cir. 1999).

The ALJ took Plaintiff's condition into account in a number of ways.  The ALJ restricted Plaintiff to work involving only simple, unskilled tasks.  The ALJ also limited Plaintiff to work that involved no more than

incidental contact with the public and occasional contact with coworkers. (A.R. 17.)

Furthermore, the medical evidence of record indicates that Plaintiff's auditory hallucinations were mainly triggered by crack use and non-compliance with his medication regimen.  On his visit with psychologist Juan Rivera in January 2009, Plaintiff told him that he was suffering from auditory hallucinations after using crack. (A.R. 256.)  However, by the time Dr. Rivera ended his treatment of Plaintiff in March of that year due to lost contact, he noted that his session with Plaintiff resulted in a good response and good medication management.  (A.R. 364.)

Virtually every single mental health professional who treated Plaintiff found that he functioned well when he was compliant with his medication regimen.  (A.R. 239, 236, 246, 362, 373, 376, 428, 430, 435-36, 451, 471, 473 & 505-6.) Indeed, Dr. Leavitt, who had by far the most gloomy prognosis for Plaintiff noted that his auditory hallucinations were triggered by a failure to take his medication.  (A.R. 246.)

Even Dr. Leavitt's assessment of Plaintiff, which was based on only a single visit, was not entirely bleak.  (Id.) Dr. Leavitt characterized Plaintiff's prognosis with

treatment as "poor," but noted that his ability to interact with coworkers could be "moderate" with psychotropic drugs. (A.R. 249.)

The ALJ gave Dr. Leavitt's findings little weight as Dr. Leavitt examined Plaintiff shortly after he had been hospitalized in January, 2009. (A.R. 16.) Instead, he gave greater weight to the findings of Dr. Whitehorn and therapist Shirley DeShields. This was entirely appropriate as ALJs are free to rely on multiple medical sources in formulating their rulings. Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 144 (1st Cir. 1987).

Dr. Whitehorn, whose assessments the ALJ generally gave some weight to, found that Plaintiff could "sustain pace, focus, and attendance at work" and "tolerate routine supervision on a job." (A.R. 425.) Furthermore, he emphasized that Plaintiff's case was unique in that every mental status evaluation was within normal limits -- except when Plaintiff went off his medications. (Id.) The ALJ gave little weight to Dr. Whitehorn's conclusion that Plaintiff only had moderate difficulties in maintaining social functioning, choosing instead to give Plaintiff the benefit of the doubt that he had more substantial difficulties. (A.R. 17.)

Plaintiff's therapist, Shirley DeShields, came to

similar conclusions as Dr. Whitehorn.  The ALJ also gave her conclusions some weight. (A.R. 17.)  In September 2009, she noted that Plaintiff was making a good adjustment with his medication and had good relationships with other residents of his drug treatment house. (A.R. 430.)  She thought that his prognosis was good so long as he continued with his medication. (A.R. 435.)

In short, there was nothing to indicate that the RFC restrictions that the ALJ tailored for Plaintiff were insufficiently supportive of his impairment.  The medical record indicates that Plaintiff had the capacity to function reasonably well on his medication regimen, and the ALJ's RFC limitations were cognizant of what he was and was not capable of.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 7) is hereby DENIED, and Defendant's Motion for Order Affirming Decision of Commissioner (Dkt. No. 10) is hereby ALLOWED.  The clerk will enter judgment for Defendant.  The case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge

14